# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Danny Monts, ) No. CV 10-0532-PHX-FJM (ECV)
)
    Plaintiff, )
)
vs. ) **ORDER**
)
Joseph M. Arpaio, et al., )
)
    Defendants. )
)

Plaintiff Danny Monts filed this *pro se* civil rights action against employees of the Maricopa County Sheriff's Office (MCSO). (Docs. 13, 79.) Plaintiff's action arose out of the denial of his request for a kosher diet (Count I) and an incident of alleged excessive force (Count IV). The remaining Defendants—Gregory Millard, Commander; Howard Tabaknek, Cantor; and Tim Burke, Detention Officer—move for summary judgment.[1] (Doc. 75.)

The Court will deny the motion as to Count I and grant it as to Count IV.

**I.    Count I—Kosher Diet (Defendants Millard and Tabaknek)**

    **A.    Legal Standards**

        **1.    Free Exercise**

To prevail on a First Amendment, free-exercise-of-religion claim, a plaintiff must show as a threshold matter that a defendant burdened the practice of plaintiff's religion by

---

[1] The Court provided Plaintiff notice pursuant to Rand v. Rowland, 154 F.3d 952, 960 (9th Cir. 1998), regarding his obligation to respond. (Doc. 78.)

1 preventing him from engaging in conduct that is rooted in a sincerely held religious belief. Shakur v. Schriro, 514 F.3d 878, 884-85 (9th Cir. 2008). Regulations that impinge on the First Amendment right to free exercise will be upheld if they are reasonably related to legitimate penological interests. Turner v. Safley, 482 U.S. 78, 89 (1987). To determine whether a prison regulation is reasonably related to a legitimate penological interest, we consider (1) whether there is a "valid, rational connection" between the regulation and the legitimate governmental interest; (2) whether there are alternative means of exercising the right that remain open to inmates; (3) the impact of the desired accommodation on guards, other inmates, and prison resources; and (4) the absence of ready alternatives. Id. at 90. An inmate need not show that the regulation impinges on a central tenet of his faith; he need only show that it impedes the exercise of a sincerely held religious belief. Shakur, 514 F.3d at 885.

### 2. Religious Land Use and Institutionalized Persons Act (RLUIPA)[2]

The Court need not consider a claim under RLUIPA. Plaintiff is not entitled to injunctive relief because he is no longer in the custody of MCSO. See Rhodes v. Robinson, 408 F.3d 559, 566 n.8 (9th Cir. 2005). In addition, damages are not available under RLUIPA against Defendants in their individual capacity, and Plaintiff makes no official-capacity claim. See Sossamon v. Texas, 131 S. Ct. 1651, 1660 (2011).

### B. Parties Contentions

In November 2009, while an inmate in MCSO jails, Plaintiff first requested a kosher diet, asserting that he is an Orthodox Jew. (DSOF ¶¶ 1, 2, 12, 14.) Although Plaintiff had been previously incarcerated in MCSO jails, he had never before declared his faith as Jewish or requested a kosher diet. (DSOF ¶¶ 6, 7; PSOF ¶¶ 6-7.) Plaintiff claims that he became interested in the Jewish religion after his father passed away in October 2006. (DSOF ¶¶ 13,

---

[2]The screening Order identifies claims under RLUIPA and the First Amendment; however, in his response, Plaintiff does not make an argument under RLUIPA, although he disputes that Defendants meet a least-restrictive-means test, which is a RLUIPA standard. 42 U.S.C. § 2000cc-1(a)(1)-(2). (Doc. 94 at 11.)

14, 15; PSOF ¶12.) He began to look into the Jewish faith in 2007 or 2008. (DSOF ¶ 12; PSOF ¶ 12.)

Plaintiff believes that, although he is not a member of a synagogue, he is Jewish because his father was Jewish. (DSOF ¶¶ 18, 46, 51, 61; PSOF ¶¶ 18, 46, 51.) He asserts that his father was not a member of a synagogue, but he practiced Judaism, although not regularly. (PSOF ¶ 20.) Plaintiff was not raised Jewish, but instead was raised by his mother, a southern Baptist. (DSOF ¶ 19.)

When Plaintiff requested a kosher diet, he was asked to provide information to support the sincerity of his belief in Judaism. (DSOF ¶ 16; PSOF ¶ 16.) Under MCSO policy, sincerity of belief can be established in a number of ways, including confirmation from a rabbi, affidavit of a family member who affirms the practice of the Jewish faith, or heredity as recognized by birth from a Jewish woman. (DSOF ¶ 17.) Defendant Millard, the MCSO volunteer rabbi, made an effort to confirm Plaintiff's faith. (DSOF ¶ 22.) Millard contacted an independent rabbi, Marc Shipkin, to interview Plaintiff. Rabbi Shipkin determined that Plaintiff was not Jewish under Jewish Law. (DSOF ¶ 22; PSOF ¶ 22.) Plaintiff contacted Rabbi Damsky and Rabbi Rosenberg to assist him in obtaining a kosher diet. (DSOF ¶¶ 25, 35; PSOF ¶¶ 25, 35.) Rabbi Damsky learned that Plaintiff was not born into the Jewish faith, and though he had some Jewish learning, he had never converted. (DSOF ¶¶ 29, 30, 31, 32.) Plaintiff next contacted Rabbi Rosenberg and spoke about his beliefs; Plaintiff asked the rabbi to help him obtain a kosher diet and Matzah. (DSOF ¶ 35; PSOF ¶ 35.) According to Defendants, Rabbi Rosenberg concluded that Plaintiff was not Jewish, so he refused to assist Plaintiff with his request for Matzah for Passover. (DSOF ¶¶ 37, 38.)

Plaintiff also asked Cantor Tabaknek about becoming Jewish, and Cantor Tabaknek explained to Plaintiff that he could not convert while he was incarcerated. (DSOF ¶ 44; PSOF ¶ 44.) To convert to Orthodox Jew takes considerably more study than either Reform Movement or Conservative. The rigorous process of conversion can take up to two years. (DSOF ¶¶ 45, 58, 59; PSOF ¶¶ 8, 59.)

**C.** **Analysis**

### a. Sincerely Held Beliefs

If the request for a particular diet is not the result of a sincerely held religious belief, the First Amendment imposes no obligation on the prison to honor the request. Plaintiff contends that he sincerely adheres to the beliefs of Judaism, one of which is that an orthodox Jew must only consume kosher food.

Defendants counter that Plaintiff has failed to establish a sincerely held belief in the religious necessity of eating a kosher diet. They assert that three independent rabbis interviewed Plaintiff and determined that he is not Jewish. Defendants are correct that First Amendment protection requires a sincerely held belief rooted in religion, but Defendants conflate the sincerity of belief with Plaintiff's membership in a congregation or with an ecclesiastical question—whether Plaintiff is a Jew under Jewish law. It is only the *sincerity* of one's belief that is relevant to the free-exercise inquiry. Shakur, 514 F.3d at 884-85.

In Jackson v. Mann, the Second Circuit rejected a district court's reliance on a rabbi's determination that an inmate was not Jewish for purposes of a prison's kosher-diet program. The Second Circuit reasoned that whether an inmate's beliefs are entitled to First Amendment protection turns on whether those beliefs are sincerely held, not on an ecclesiastical question whether the inmate is a Jew under Jewish law. 196 F.3d 316, 320-21 (2nd Cir. 1999); see also Ford v. McGinnis, 352 F.3d 582, 593-94 (2d Cir. 2003) (the role a religious feast played in a prisoner's practice of Islam determined whether there had been a substantial burden to his religious practice, not the testimony of Muslim clerics as to the proper celebration of the feast); Kroger v. Bryan, 523 F.3d 789, 799 (7th Cir. 2008) (holding that "clergy opinion has generally been deemed insufficient to override a prisoner's sincerely held religious belief"); Reiss v. Stansel, 2011 WL 2111999, * 5 (D. Ariz. May 26, 2011).

Here, it appears that the rabbis were not assessing the sincerity of Plaintiff's belief but rather, reaching an ecclesiastical determination under Jewish Law. While membership in an organized religion is relevant to the question of sincerity of beliefs, it is not determinative. As the Supreme Court has stated "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular

- 4 -

litigants' interpretations of those creeds." Hernandez v. Comm. of Internal Revenue, 490 U.S. 680, 699 (1989). "The right to the free exercise of religion is . . . the right of a human being to respond to what that person's conscience says is the dictate of God." Ward v. Walsh, 1 F.3d 873, 876 (9th Cir. 1993).

In addition to the statements of the rabbis and the lack of an affidavit from a synagogue, Defendants cite Plaintiff's repeated purchases of non-kosher foods from the prison canteen, smuggling of non-kosher meat, and his failure to repent his sins to a cantor or rabbi. (Doc. 103; ref. Doc. 76, DSOF ¶¶ 65-66, 68.) Plaintiff counters that he did not purchase non-kosher food for his own consumption, and that he has repented his sins and asked for forgiveness on numerous occasions, including Rosh Hashanah and Yom Kippur 2009. Id. ¶¶ 21-23. In addition, Plaintiff offers evidence that he has attended classes of Torah and Bible study offered by Tabaknek, id. ¶ 20, that he asked Rabbi Damsky to study Judaism with him, id. ¶ 13; Doc. 76, Ex. E. Damsky Decl. ¶ 12, and that he asked Tabaknek to assist him in completing the conversion process. (DSOF ¶ 44.) Thus, Plaintiff offers evidence that he has repeatedly requested a kosher diet, he has studied Judaism, and he has attempted to undertake the studies that the rabbis consider necessary for conversion.

The sincerity of beliefs is often a question of fact not appropriate for decision at summary judgment. In Patrick v. LeFevre, 745 F.2d 153, 157 (2d Cir. 1984), the Second Circuit reasoned that scrutiny of a prisoner's sincerity is a means of "differentiating between beliefs that are held as a matter of conscience and those that are animated by motives of deceptions and fraud." Id.

While Plaintiff's case is weak, his repeated efforts to obtain a kosher diet, his studies, and his requests for conversion to satisfy jail officials create a triable issue of fact as to the sincerity of his beliefs. See Reiss, 2011 WL 2111999, * 7.

### b. Legitimate Penological Justification

Defendants argue that, even if it is assumed that Plaintiff has met his threshold burden of showing that a defendant has burdened the practice of his religion by preventing him from engaging in conduct that is rooted in a sincerely held religious belief, they have met the

Turner factors. They assert that the jail has a compelling governmental interest in running a simplified food service and a compelling interest in protecting the integrity of its religious diet program and avoiding the appearance of favoritism which could cause security problems, including risk to the safety of the Chaplains, officers, and inmates. (Doc. 75 at 11.) Defendants' justification for refusing to provide Plaintiff a kosher diet is that they reasonably restrict kosher meals to those inmates with a sincerely held religious belief. But, as discussed, the Court will deny Defendants' summary judgment on the issue of Plaintiff's sincerely held belief. Moreover, Defendants offer only conclusory statements from Millard as evidence of risk to anyone's safety. (See Doc. 76, Ex. 2, Millard Decl. ¶ 5.) In addition, it is undisputed that Defendants already offer a kosher diet. If Plaintiff's request for such a diet is a sincerely held religious belief, denying Plaintiff's request cannot be justified by an interest in running a simplified food service or the integrity of the religious diet program.

As to the alternative means of practicing his religion—the second Turner factor, Defendants assert that Plaintiff could study the Torah, wear a Yarmulke, engage in Bible study, observe Jewish holy days, and receive a vegetarian diet. (Doc. 75 at 11.) But the evidence cited by Defendants shows only that Plaintiff was permitted to wear a Yarmulke in his cell and to fast when he asked to do so. (DSOF ¶ 23, Ex. 2, Millard Decl. ¶14.) Plaintiff claims that Tabaknek had Plaintiff's Torah confiscated and that without the Torah, wearing the Yarmulke is "void" because Plaintiff could not study his Torah. (Doc. 94 at 9, Doc. 97, Ex. 20, Inmate Grievance.) Thus, viewing the facts in the light most favorable to Plaintiff, there is a disputed issue of fact as to the availability of some of the alternative means to practice his religion.

Regarding the third Turner factor–the impact an accommodation will have on guards, other inmates, and prison resources–Defendants argue that providing a kosher meal to a non-Jewish inmate will arouse jealousy and envy among other inmates who might perceive the prison as showing favoritism. But the favoritism argument has been discounted because the argument "is present in every case that requires special accommodations for adherents to particular religious practices." Shakur, 514 F.3d at 886. Defendants present no other

evidence or argument to support the third Turner factor.

The fourth factor—the absence of ready alternatives—also does not weigh in Defendants' favor. Plaintiff suggests, for example, that he could provide his own affidavit of sincerity. (Doc. 94 at 11, citing Kroger, 523 F. 3d at 801 (indicating that written verification need not be from a clergy member and could be from the prisoner but that prison officials could require that such a verification be accompanied by other indicia of a sincerely held belief)).

Finally, contrary to Defendants' suggestion, a plaintiff in a § 1983 need only show a municipal "policy" or "custom" that caused the plaintiff's injury if the plaintiff seeks to impose liability on a *municipality*. Bd. of County Comm'rs, 520 U.S. at 403.

On the record before us, we must deny Defendants' request for summary judgment on Count I.

**II.     Count IV—Excessive Force (Defendant Burke)**

     **A.     Legal Standard**

The Fourth Amendment establishes the constitutional parameters for claims of excessive force during pretrial detention. Lolli v. County of Orange, 351 F.3d 410, 415 (9th Cir. 2003) (citing Gibson v. County of Washoe, 290 F.3d 1175, 1197 (9th Cir. 2002)). The relevant question is whether the force used "was objectively reasonable 'in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation.'" Gregory v. County of Maui, 523 F.3d 1103, 1106 (9th Cir. 2008) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)).

To determine the "reasonableness" of a particular action, a court must balance the nature and quality of the intrusion against the countervailing governmental interests. Graham, 490 U.S. at 396. The Fourth Amendment does not prohibit the use of reasonable force. Tatum v. City and County of San Francisco, 441 F.3d 1090, 1095 (9th Cir. 2006). Moreover, [t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. "Not every push or shove, even if it may later seem unnecessary in the peace

of a judge's chambers, violates the Fourth Amendment." Graham, 490 U.S. at 396-97 (citation omitted).

The Supreme Court has clarified the summary judgment standard for excessive-force claims, rejecting the argument that the question of objective reasonableness is "a question of fact best reserved for a jury." Scott v. Harris, 550 U.S. 372, 381 n.8 (2007). "At the summary judgment stage . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record . . . the reasonableness of [the defendant's] actions . . . is a pure question of law." Id.

### B.     Parties' Contentions

Some of the events are captured on video, which Defendants provide to the Court. (Doc. 76, Ex. 11.) The DVD shows five scenes. (DSOF ¶ 81; PSOF ¶ 81.) Plaintiff asserts that Burke used excessive force when he cuffed Plaintiff, slammed him into a wall twice, and when he took the cuffs off. (PSOF ¶ 82.)

Plaintiff was housed at Towers Jail when he was ordered moved to a new unit. (DSOF ¶¶ 71, 72; PSOF ¶ 72.) Plaintiff was ordered to "roll up" his belongings for the move. He did not comply, stating he had a medical issue with his back. (DSOF ¶ 72-73; PSOF ¶¶ 72-73.) Defendant asserts that Plaintiff used foul language and told the officers that they would have to move the items. (Doc. 76, Ex. 10, Burke Decl. ¶ 7.) Defendant asserts that Plaintiff was agitated. (DSOF ¶ 78.) Plaintiff claims that he was upset because he was being told to jeopardize his health in order to move. (PSOF ¶ 78.) When Plaintiff continued to refuse the order, Defendant approached him, ordered him to get his belongings, and when Plaintiff did not comply, Defendant took Plaintiff by the wrist and moved Plaintiff to the Pod wall to hand cuff him. (DSOF ¶¶ 74, 77, 88.) Plaintiff asserts that Defendant "slammed" him into the wall and cuffed him. (PSOF ¶ 77.)

Plaintiff further asserts that after being removed from the pod, he was "slammed" into the wall in the core area and that this is not captured on the video. (PSOF ¶ 89.) Defendant attests that he placed Plaintiff against the wall and instructed him not to move. (Doc. 76, Ex. 10, Burke Decl. ¶ 9.) Defendant also attests that he was concerned for the safety of the

officers because of Plaintiff's agitated behavior. Id. Plaintiff claims that as Defendant escorted him through the breezeway, Defendant jerked Plaintiff from side to side. (PSOF ¶ 93.) Plaintiff also claims that when he was placed in a holding cell, Defendant kneed him in the back. (PSOF ¶ 95.) Defendant attests that he placed Plaintiff against the wall in the holding cell in order to safely remove the cuffs and that after removing one cuff, Plaintiff pulled his other arm away, so Defendant pushed Plaintiff against the wall more firmly to regain control and remove the cuff. (Doc. 76, Ex. 10, Burke Decl. ¶¶ 10-11.)

Plaintiff contends that he suffered head injuries, bumps and bruises, shoulder pain, and further injury to his back, and he was not seen by medical staff for three days. (PSOF ¶ 97.)

### 3. Analysis

The Court will grant summary judgment to Defendant. Insofar as the relevant events are captured on video, the video surveillance footage shows that no excessive force was used on Plaintiff, and Plaintiff fails to create a triable issue of fact that the remainder of the alleged force was unreasonable.

As noted, Fourth Amendment analysis of excessive force requires a court to balance the "nature and quality of the intrusion" on a person's liberty with the "countervailing governmental interests at stake" to determine whether the use of force was objectively reasonable under the circumstances. Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1051, 1056 (9th Cir. 2003) (citing Graham, 490 U.S. at 396). The objective-reasonableness inquiry under Graham involves a three-step analysis. Miller v. Clark County, 340 F.3d 959, 964 (9th Cir. 2003). First, the court must evaluate the type and amount of force used. Next, it must assess the importance of the governmental interests at stake by considering the factors set out in Graham—the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting or attempting to evade arrest. Finally, the court must balance the "gravity of the intrusion on the individual against the government's need for the intrusion." Id. The need for force is at the heart of Graham. Drummond, 343 F.3d at 1057 (citation omitted).

### a. Type and Amount of Force

The Court has reviewed the video surveillance footage. (See Doc. 76, Ex. 11.) During the initial encounter, Defendant does not "slam" Plaintiff into the wall nor does he jerk Plaintiff's arms in applying the hand cuffs; rather, Defendant pulls Plaintiff out of his chair and moves him toward the wall. There is no incident as Defendant escorts the Plaintiff out of the pod and down a hallway. It does not appear to the Court that Defendant jerks Plaintiff from side to side but rather that Plaintiff pulls away. In sum, insofar as the events are shown on the video, Plaintiff's version of events is not supported by the video tape evidence. See Scott, 550 U.S. at 380.

Plaintiff asserts that he received unspecified head injuries, bumps and bruises, and shoulder pain, but he provides no evidence of the nature of the injuries or evidence of lasting effect. The extent of injury can be evidence of the amount of force used. Schwenk v. Hartford, 204 F.3d 1187, 1196 & n.6 (9th Cir. 2000). Even assuming some bruising and pain, the Court finds that the force used was minimal.

### b. Government Interest

Next, the Court considers the government's interests, especially in light of the Graham factors. Although Plaintiff asserts that he did not comply with the order because of a medical issue, he admits his failure to comply. (PSOF ¶¶72-73.) The video shows that other inmates were in the area when Plaintiff refused to obey the order. It is beyond dispute that "maintaining institutional security and preserving internal order and discipline are essential goals" for jail officials and security personnel. Bell v. Wolfish, 441 U.S. 520, 546 (1979). The need to restore order in a jail does not depend on an actual fight or obvious imminent danger. Plaintiff does not deny that he used foul language, that he was upset, or that he refused to move his belongings. The possibility that Plaintiff would continue to refuse to obey the order and cause disruption was sufficient to justify the use of some force.

The most important Graham factor is whether a suspect posed an immediate threat to the safety of the officers or others. Miller, 340 F.3d at 964. Defendant attests that he was concerned for officer safety due to Plaintiff's agitated state. Although Plaintiff argues that the safety of others was of no concern to Defendant and that Defendant acted for the sole

purpose of causing harm (Doc. 94 at 13), this is mere speculation by Plaintiff and insufficient to defeat summary judgment. See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). Likewise, Defendant asserts that when they were in the holding cell and he attempted to remove the cuffs, Plaintiff pulled his arm away, which necessitated additional force to regain control. Plaintiff does not deny pulling his arm away from Defendant. And Plaintiff's suggestion that another officer present did not use his radio because he knew that Defendant's action was excessive is mere speculation. Even assuming that Defendant kneed Plaintiff, the Court finds that this factor weighs in favor of the government.

The third Graham factor is whether Plaintiff was actively resisting. Plaintiff admits that he refused the order to roll up his belongings and does not deny pulling his arm away as Defendant attempted to remove the cuff. Thus, the third Graham factor weighs in the government's favor.

The Court finds that the government had a significant interest in maintaining order by securing and removing Plaintiff and placing him in a holding cell.

### c. Balancing the Force Against the Need for Force

Finally, the Court holds that the force used was reasonably necessary under the circumstances. The required determination—balancing the force used against the government's interest—"must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97.

As noted, the video does not support Plaintiff's version of the force used, and Plaintiff fails to show that the other alleged force was unreasonable. The force used was minimal, and, balanced against the need for force, it was appropriate. Plaintiff complains that Defendant could have acted differently when initially securing Plaintiff by securing the pod first and then restraining Plaintiff. (Doc. 94 at 19.) But the appropriate inquiry is whether the officer acted

reasonably, not whether he had a less intrusive alternatives available to him. See Scott v. Henrich, 39 F.3d 912 (9th Cir. 1994). The Fourth Amendment does not require that officers use the least amount of force necessary. Mattos v. Agarano, 590 F.3d 1082, 1088-89 (9th Cir. 2010) (citing Scott, 39 F.3d at 915).

The Court will grant summary judgment to Burke and dismiss Count IV.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 75) and Plaintiff's Motion for Ruling (Doc. 104).

(2) Defendants' Motion for Summary Judgment (Doc. 75) is **granted in part and denied in part as follows:**

    (a) **granted** as to the claim for excessive force; and

    (b) **denied** in all other respects.

(3) Count IV and Burke are dismissed.

(4) Plaintiff's Motion for Ruling (Doc. 104) is granted as set forth in this Order.

(5) The remaining claim is the First Amendment claim for damages regarding denial of a kosher diet. It is exceedingly weak.

DATED this 18th day of January, 2012.

_Frederick J. Martone_
Frederick J. Martone
United States District Judge